UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:14-CR-44-TLS |
| | ) | |
| COREY S. CASTETTER | ) | |

**OPINION AND ORDER**

The Defendant, Corey S. Castetter, pled guilty to possession with intent to distribute a Schedule II controlled substance, methamphetamine, in violation of 21 U.S.C. § 841(a)(1). The probation officer drafted a Presentence Investigation Report (PSR) in preparation for sentencing. The Court now resolves the Defendant's objections to the PSR.

**BACKGROUND**

On September 4, 2014, law enforcement officers conducted a traffic stop of a vehicle in Michigan, during which officers located four ounces of crystal methamphetamine. Pursuant to a search warrant authorized by a state magistrate in Michigan, this vehicle had been fitted with a GPS unit. According to information gathered from the GPS unit, on August 30, 2014, this vehicle arrived at the Defendant's residence, located at 6174 West Noe Street, Kimmel, Indiana. The vehicle arrived at the Defendant's residence at about 12:48 PM, and stayed for about 30 minutes before returning to Michigan. An informant told Michigan authorities that he knew the vehicle's driver had driven to Kimmell, Indiana, and returned to Michigan with methamphetamine. On September 4, 2014, GPS data showed that the vehicle arrived at the Defendant's residence at about 12:10 PM, and stayed for about 1 hour and 22 minutes before returning to Michigan. The vehicle made no significant stops before officers executed the search

warrant on the vehicle in Michigan.

After the Michigan authorities located the four ounces of crystal methamphetamine in the vehicle, Task Force Officer (TFO) Sean Lundy of the Drug Enforcement Agency obtained and executed a state search warrant of the Defendant's residence. This also occurred on September 4, 2014. The Defendant and his adult son were in the residence when the warrant was executed. The Defendant's residence is a one-story house with a basement. In the house, officers located surveillance video equipment that was in a box, including infrared equipment for night vision. A closet in the Defendant's bedroom contained a Winchester, .30-30 caliber, lever-action, high-powered rifle. Although the rifle was stored in a leather case, TFO Lundy testified that it was not "kept in very good condition" and was not being kept in a manner consistent with being a collector's item. (Sentencing Evidentiary Hr'g Tr. 55:17, Mar. 14, 2016.) The officers also found a semi-automatic shotgun leaning against a wall in the corner of a room that connected the Defendant's bedroom with the living room and kitchen area. TFO Lundy testified that one of these firearms was loaded and believed to the best of his knowledge that the shotgun was loaded. A one-gallon Ziploc bag containing a distribution amount of synthetic marijuana or "spice" was also found in a breezeway near the kitchen that led to the basement's entrance, meaning that the shotgun and the bag of synthetic marijuana were on opposite ends of the house.

In the basement, there was a workbench area and an open crawl space filled with dirt. In the workbench area, the officers found about an ounce of crystal methamphetamine that was on top of some storage containers. Further, a digital scale was stored above the workbench amid the floor joists, along with a spoon on the work table that contained a liquified drug substance. There was also a "pre-loaded" syringe that contained narcotics, as well as other syringes. (*Id.* 24:15.) In

2

addition to the digital scale, the officers located a triple-beam style scale. In the crawl space, the officers saw digging tools and a piece of cardboard covering an area of dirt that appeared freshly disturbed based on its texture. The officers also saw a plastic bag partially sticking out from the dirt. When the officers retrieved the bag, they located bundles of United States currency that were tied together with new rubber bands. A false wall in the basement near the stairs contained envelopes with approximately $1,000 in each, and many of those envelopes had numbers on them that "would be . . . consistent with the price of the ounces of methamphetamines." (*Id.* 35:4–16.) A reliable drug dog later alerted to the presence of drugs on the money, which TFO Lundy testified was an indication that "the money there or the currency has been, in the past . . . involved in the vicinity or close with narcotics." (*Id.* 53:5–13.) The officers recovered about $62,090 in cash from the Defendant's basement, which was buried in the dirt or hidden behind a wall. The parties have stipulated that $49,050 of this money is drug money.[1]

The Defendant was charged with possession with intent to distribute a Schedule II controlled substance, methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 1); maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(2) (Count 2); and possession of a controlled substance, including methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 844 (Count 3). On August 20, 2015, the Defendant entered a plea of guilty to Count 1 of the Indictment [ECF No. 16] Pursuant to the terms of the Plea

---

[1] On September 23, 2016, the Court held an evidentiary hearing to address the drug quantity objection after it became apparent that the parties had a misunderstanding about whether the Defendant decided to withdraw his objection to the drug quantity before the March 14, 2016 evidentiary hearing. The parties have stipulated that of the $62,090 seized by the government, $12,500 which comprises of inheritance money and gambling winnings by the Defendant, is to be exempted from the drug quantity calculation.

Agreement [ECF No. 38], the Government agreed to dismiss Counts 2 and 3 of the Indictment at the time of sentencing.

The PSR includes a two-level enhancement to the base offense level on grounds that the Defendant possessed "a dangerous weapon (including a firearm)." U.S.S.G. § 2D1.1(b)(1). The base offense level was also increased by two levels for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. *Id.* § 2D1.1(b)(12). The Defendant objected to both of these enhancements. In the First Addendum to the PSR [ECF No. 52], the probation officer summarized the Defendant's position that the dangerous weapon enhancement is inappropriate because the Defendant lived in a rural setting and both he and his son are hunters. Further, both weapons were identified as unloaded hunting rifles that were secured in gun cases far from the drugs in the house. The Government disagreed with the Defendant's description of the facts. After reviewing the offense conduct, investigative documents (including photographs), and speaking with the case agent, the probation officer listed several facts supporting the enhancement and concluded the enhancement was justified. Regarding the drug premises enhancement, the Defendant asserted that there was a lack of evidence to support the enhancement, particularly addressing the frequency of drug related purposes at the residence. The Government principally responded that the facts were legally sufficient to support the enhancement, and the probation officer determined the enhancement was justified after reviewing the relevant information. The Court scheduled an evidentiary hearing to address the objections.

Following the evidentiary hearing, the Defendant maintained his position that both enhancements are unsupported by the case's facts and the applicable law. The Court will address

each objection in turn, and for the reasons stated below, finds that both enhancements were appropriately applied.

## ANALYSIS

**A.     Gun Enhancement**

Section 2D.1.1(b)(1) of the United States Sentencing Guidelines Manual allows for a two-level increase in the base offense level 'if a dangerous weapon (including a firearm) was possessed." The Commentary to this enhancement states that

> The enhancement for weapon possession . . . reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1 cmt. n.11(A). The Seventh Circuit has "repeatedly held that 'the Government bears the initial burden of demonstrating [by a preponderance of the evidence] that the defendant possessed a weapon in a place where drugs were present,' and that 'once the Government meets its burden, the defendant must demonstrate that it was clearly improbable that the weapon was connected to the offense.'" *United States v. Bjorkman*, 270 F.3d 482, 492 (7th Cir. 2001) (first quoting *United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001); then *United States v. Rollins*, 544 F.3d 820, 837 (7th Cir. 2008). To meet its burden, the Government only needs to prove that "the weapon was possessed during the offense," *Rollins*, 544 F.3d at 837, and possession of the weapon may be actual or constructive, *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005); *United States v. Brack*, 581 F.3d 539, 763–64 (7th Cir. 1999) (affirming gun enhancement where weapons were unloaded when police found them).

5

The Court finds that the Government has met its burden. First, the Defendant possessed the shotgun because it was present in his home and was strategically placed, leaning against a wall in the corner of a room. This room connected the Defendant's bedroom with the living room and kitchen area, making the shotgun readily accessible to the Defendant. TFO Lundy testified that even though the shotgun could be used for hunting, the Defendant did not have a hunting license and the shotgun is an ideal weapon for protection in close quarters, as in a house where drugs are kept. Further, although the enhancement may apply even if the weapon is unloaded, TFO Lundy testified that he believed to the best of his knowledge that the shotgun was loaded. Second, the shotgun was possessed during the offense (possession with intent to distribute methamphetamine) because the police found the shotgun pursuant to the same search that revealed the methamphetamine. "This evidence is sufficient to support the district court's conclusion that" the Defendant "had constructive possession of the gun found at his home and that the gun was used in connection with his drug activity." *United States v. Perez*, 581 F.3d 539, 546–547 (7th Cir. 2009) (enhancement applied where drugs were stored and sold); *United States v. Idowui,* 520 F.3d 790, 793 (7th Cir. 2008) (same); *see also Bothun*, 424 F.3d at 586 ("[G]uns found in close proximity to drug activity are presumptively connected to that activity.").

Once the Government meets its initial burden, the Defendant "must demonstrate that it was clearly improbable that the weapon was connected to the offense." *United States v. Martin*, 287 F.3d 609, 617 (7th Cir. 2002) (internal quotation marks and citations omitted). As an example of clear improbability, Application Note 11(A) to § 2D1.1(b)(1) states that "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." *See also United States v. Grimm,* 170 F.3d 760, 767–68

(7th Cir. 1999) (holding that it was not "clearly improbable" where a weapon was used in connection with a drug offense even though the gun was not found in a place where drugs were present but was found in a car that had been used to transport a shipment of drugs six weeks earlier). Given the factual record, as described above, the Court finds that a showing of clear improbability has not been made. Accordingly, a two-level enhancement under § 2D1.1(b)(1) is appropriate.

B.  **Drug Premises Enhancement**

Pursuant to Guideline § 2D1.1(b)(12), the offense level is increased by two levels if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Application Note 17 to § 2D1.1 provides that the enhancement includes the "storage of a controlled substance for the purpose of distribution." Additionally, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.*; *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013); *see also United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) (holding that enhancement applies when a defendant uses the premises for the purpose of substantial drug trafficking activities even if the premises is also the family home) The "frequency and significance of the illicit activities conducted on the premises" are to be considered in the assessment. *Flores-Olague*, 717 F.3d at 533. This includes "quantities dealt, customer interactions, storage of 'tools of the trade,' maintenance of business records, the use of a child to deliver narcotics, and acceptance of payment." *Id.*

7

The PSR assessed the total drug quantity found in the home to be at least 500 grams but less than 1.5 kilograms of methamphetamine, yielding a base offense level of 34. (PSR ¶ 26, ECF No. 71.) This offense conduct includes the 11.6 grams of methamphetamine recovered in a traffic stop on September 14, 2014, the 25.8 grams of methamphetamine located in the defendant's home, and the few ounces of methamphetamine the Defendant told TFO Lundy he had sold to a man from the Michigan area and the several ounces he had obtained a couple of weeks prior to his arrest that he had also sold. (*Id.* ¶ 16.) The offense conduct also includes the stipulated $49,590 found buried in dirt in a crawl space and in an open space in a basement wall that the Defendant admits is drug proceeds. At the Defendant's own admitted going rate of $1,400 per ounce of methamphetamine, the cash from the drug proceeds converts to 1,004.15 grams.[2] The methamphetamine recovered at the traffic stop, the defendant's home, and cash proceeds is more than enough to clear the 500-gram threshold for the increased offense level, even if the going-rate was substantially lowered. "When there is a sufficient basis to believe that cash found in a defendant's possession was derived from drug sales, a court properly includes the drug equivalent of that cash in the drug-quantity calculation." *United States v. Simmons*, 528 F.3d 730, 737 (7th Cir. 2009) (citing *United States v. Rivera*, 6 F.3d 431, 446 (7th Cir. 1993)).

The Court finds there is a sufficient basis to conclude that the cash was derived from drug sales because of the Defendant's admission that the cash was drug money, the proximity of the cash to the evidence of drug distribution, and the lack of legitimate income. The Defendant admitted the cash was drug sale proceeds. The cash was buried in the Defendant's basement. Drug dealers do not generally use banks because a bank account leaves a paper trail. The cash

---

[2] The conversion rate assumes 28.35 grams per ounce.

was bundled with new rubber bands, demonstrating a recent and ongoing stash. Some of the cash was packaged in amounts consistent with trafficking in distribution quantities. After the seizure of the cash from the Defendant's basement, a drug detection dog alerted to the presence of drugs on the money confirmed that the money was in close proximity to illegal drugs. The cash was concealed near the Defendant's scales and other implements of distribution. The cash was also secured under the protection of the shotgun. The placement of the shotgun made it so that any potential robber or burglar would have to cross paths with the Defendant armed. Furthermore, the Defendant earned only about $1,200 per month from 2006 to his arrest (PSR ¶ 67), making it highly unlikely the Defendant would have been able to save $49,050 in cash. Accordingly, a two-level enhancement under § 2D1.1.(b)(12) is appropriate.

## CONCLUSION

For the reasons stated above, the Defendant's objections to the PSR are OVERRULED. A Sentencing Status Conference is SET for Monday, January 30, 2017 at 10:00 AM. Sentencing is CONFIRMED for Tuesday, February 7, 2017 at 10:00 AM

SO ORDERED on December 18, 2016.

                                        s/ Theresa L. Springmann
                                        THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT